2025 IL App (1st) 221137-U

No. 1-22-1137

Order filed August 8, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 12527 |
| | ) | |
| VICTOR BAUTISTA, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

**ORDER**

¶ 1    Defendant Victor Bautista was charged with separate counts of harassment of a witness and intimidation involving two siblings, Audrey and Valentin Gudino. Following a jury trial, defendant was acquitted of harassment of a witness with respect to Audrey, but found guilty of the remaining three charges. During the pendency of this appeal, defendant moved to expedite the resolution of this case on the basis that the United States government had initiated a deportation

proceeding against him and that its outcome was contingent on whether defendant prevailed in this court. We granted that motion on July 11, 2025, and accordingly expedited our review of this case.

¶ 2    For the reasons that follow, we reverse the judgment of the trial court and remand for a new trial with instructions to assign the case to a different judge.[1]

¶ 3                                   I. BACKGROUND

¶ 4    On November 25, 2020, a grand jury indicted defendant with three counts of harassment of a witness and three counts of intimidation with respect to Audrey Gudino, and three counts of harassment of a witness and three counts of intimidation with respect to Valentin Gudino. The harassment of a witness counts all alleged that defendant intended to harass Audrey and Valentin specifically because of their potential testimony in a legal proceeding and communicated a threat of injury—namely, that defendant threatened to kill Valentin, Audrey, and her son. The intimidation counts likewise alleged that defendant intended to intimidate Audrey and Valentin into not cooperating with a pending court case by making threats to harm Valentin, Audrey, and her son.

¶ 5    Defendant's jury trial commenced on May 3, 2022. Audrey, with the assistance of a Spanish interpreter, testified that she had two sons, who were 23 and 17, and three brothers, one of whom was Valentin. On November 9, 2019, one of Audrey's other brothers, Jose Gabrielle Gudino, was killed in an auto accident. An individual named Christopher Lopez was initially cited for a traffic violation related to Jose's death. On December 30, 2019, Audrey and Valentin attended

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

court at the Daley Center in downtown Chicago. When Lopez's case was called, Audrey, one of her sons, and Valentin stood up. Audrey testified that there were "10 to 15 people" with Lopez in the courtroom who looked at them "in an aggressive manner" and took photos of them with their phones. She further testified that she was approximately three feet away and could hear them speaking.

¶ 6 On September 23, 2020, after Lopez was charged criminally with Jose's death, Audrey appeared in court in Bridgeview with Valentin and her son, Hector. She saw "10 to 15 people" there in support of Lopez who were about six feet away, and some of them were people she had seen on December 30, 2019. Some people in the group were pointing fingers at them and talking about them, and she heard one of them say, "There goes that son of a bitch." Audrey identified defendant as one of the people she recognized from that court date. She heard defendant speaking that day in Spanish, and she said his voice was distinctive because his accent was "like that of people who are from Central America."

¶ 7 On October 2, 2020, at approximately 5:30 p.m., Audrey was in her kitchen with her mom, sister, and Valentin when she received a phone call. She recognized the male voice on the phone from somewhere, and the man told her, "I have your son. I'm going to kill him. Goddamn f*** bitch, I'm going to kill your goddamn f*** son." Audrey's son, Hector, who went by the nickname Pele, was not home at the time and the last time she had talked to him was several hours earlier. She proceeded to call Hector 16 to 20 times, but he did not answer. Valentin then called the number of the man who threatened them and used the phone's speaker so Audrey could hear.

¶ 8 The man who answered the phone continued to threaten Audrey's son. When Valentin asked if the man wanted money, he responded:

"No, no, motherf***. I'm going to kill your nephew. You don't know who I am. You don't know who I am. You goddamn son of a bitch. I'm Victor Bautista. And I'm going to kill your nephew. And I'm going to kill you and your goddamn bitch sister if you do not do away with the charges against Christopher Lopez."

¶ 9 After the call ended, which lasted for approximately seven minutes, Valentin called 911. The police arrived forty minutes later, at which time Audrey received a call from her son, who was unharmed and at the movie theater. On October 9, 2020, Audrey identified defendant in a photo array as one of the people she saw in court. After the phone call on October 2, 2020, Audrey covered her windows with boards, changed her locks, and installed cameras at the front and rear of the house.

¶ 10 On November 8, 2020, Audrey was at home with Valentin when Valentin received a phone call. Audrey testified that a female caller identified herself as Evelyn Henriquez, defendant's wife, and that she threatened them, but provided no additional details.

¶ 11 On cross-examination, Audrey testified that her only involvement in Lopez's case was to testify that she saw her brother, Jose, alive on November 8, 2019. She did not actually witness the car accident that killed Jose, nor did Valentin. Audrey testified that she gave a video-recorded statement to detectives, but when asked whether she told detectives that defendant was present in court on December 30, 2019, Audrey responded that she could not remember because she was taking medication at the time that affected her memory. However, she eventually admitted that she was mistaken in previously telling police that she saw defendant in court on December 30, 2019, and that she saw him for the first time in court on September 23, 2020. She did not inform anyone

of her mistake. She also acknowledged that during the first phone call she received from defendant, he never mentioned Lopez or his case.

¶ 12    After a sidebar, the Spanish interpreter was replaced. When defense counsel questioned Audrey about the content of defendant's threats, her description of defendant's words changed slightly:

> "And I heard my brother Valentin say, 'Calm down. Let him talk. Don't you know who I am? Don't you know who I am? I'm going to kill you and your bitch sister Audrey.' He said his name as well. He said, 'I'm going to kill you, Valentin, and your sister, and I'm going to go kill you. I'm going to go put an AK-47 on your head if you don't dismiss the case of Christopher Lopez.' "

¶ 13    Audrey testified that neither she nor Valentin identified themselves to defendant or told defendant their names.

¶ 14    Valentin testified similarly to Audrey in that he attended court on December 30, 2019, with Audrey and her son. Once there, he saw 15 to 20 people in support of Lopez, several of whom were pointing at him and his family and mocking them. On September 23, 2020, Valentin attended another court hearing and he testified that someone said, "there goes that mother f***" as he entered the court room. Valentin identified one of the individuals present in the courtroom on that day as defendant. An assistant State's attorney informed him that he was going to be a witness in Lopez's trial as the last person who saw Jose alive.

¶ 15    On October 2, 2020, Audrey received a phone call from someone threatening her son. After the call ended, Valentin called the number back. Valentin recognized the voice of the man who answered as defendant, because he heard defendant speaking at the courthouse. Defendant

threatened to kill Valentin and demanded, "You better stop these charges against Christopher Lopez." On October 9, 2020, Valentin identified defendant in a photo array as the person who had threatened him.

¶ 16    Valentin also testified that on October 19, 2020, he met with an assistant State's attorney and told him that the first time he saw defendant was in court on December 30, 2019. However, Valentin admitted that his statement was mistaken, and that he did not see defendant on that court date.

¶ 17    On November 8, 2020, Valentin received a call from Evelyn, who identified herself as defendant's wife. She asked Valentin to explain why he was "putting charges" against her husband, and Valentin described her as loud and very upset. She then stated, "If you don't stop these charges against my husband and Christopher Lopez, Jose Lopez will take care of business."

¶ 18    Before it rested, the State stipulated that on December 30, 2019, defendant was subjected to electronic GPS monitoring and that defendant was never at the Daley Center courthouse on December 30, 2019.

¶ 19    Lopez testified in defendant's case-in-chief that he pled guilty to reckless homicide involving Jose Gudino and that he was currently housed in the Cook County Department of Corrections. Lopez denied knowing, speaking to, or ever seeing defendant before his testimony. He asserted that defendant had never appeared with him in court, and that he also did not know anyone named Evelyn Henriquez. On cross-examination, Lopez denied having a brother named Jose and claimed he had three siblings, Manuel, Steve, and Cynthia.

¶ 20    Evelyn testified that she was married to defendant and they had three children together. On October 2, 2020, she and defendant argued over some text messages that were sent to her. After

defendant saw the messages, she deleted them and the phone number from which they had originated. Defendant then took Evelyn's phone and left for approximately two hours. Evelyn's contacts contained a phone number for someone named Audrey, who was Evelyn's previous supervisor at World Famous Chocolates. Evelyn testified that the number belonged to Audrey Gudino. She further explained that the text messages that were the basis of the argument with defendant were from someone named Antonio.

¶ 21 On November 8, 2020, Evelyn called Valentin using a phone number she got from defendant's previous attorney. She denied threatening anyone and denied telling anyone that they should drop the cases against Lopez and defendant or that Lopez's brother, Jose, would "take care of business." She acknowledged asking the person who answered the phone "what Victor Bautista did to get you upset and for you to sue him." She denied knowing anyone named Christopher Lopez or Jose Lopez, and claimed she told the person on the phone that she did not know of any relationship between Christopher Lopez and defendant.

¶ 22 Defendant then called Valentin in his own case, who reiterated that Evelyn called him in the evening of November 8, 2020, and that she identified herself as defendant's wife. She asked Valentin to explain the basis of the charges against defendant, and Valentin suggested she talk to her attorney. He testified that Evelyn told him that Jose Lopez would "take care of business" if the charges against defendant and Christopher Lopez did not go away.

¶ 23 Defendant testified in his own defense. He explained that on October 2, 2020, he and his wife had an argument because he found a romantic conversation on his wife's phone. He was focused on the content of the conversation rather than the name of the individual, but he knew the person's name began with "A." After the fight, Evelyn left her cell phone on the table and went to

the bathroom. Defendant took her cell phone and went to a nearby park. Because he could not remember the individual's name, defendant added to his own phone several phone numbers of people in Evelyn's phone whose names started with "A." He then purchased some tequila and beer from the liquor store and began drinking.

¶ 24 Defendant traveled to the barbershop he owned and, after getting drunk, began calling some of the numbers he took from Evelyn's phone. When he dialed one, a woman answered the phone, and defendant believed it was the wife of the person for whom he was searching. He asked, "Why do you keep calling my wife? Don't you know she's married and she got children?" He also told the person on the phone, "You are destroying my life, you mother f***, but this is going to ended [*sic*] up fixed. I'm going to take care of this." The phone call lasted approximately 40 seconds and then he hung up.

¶ 25 Twenty minutes later, defendant got a call from the same number, but the person on the other end was a man. Defendant claimed that the man threatened to "f*** him up" if defendant did not stop calling his sister. Defendant responded by saying, "Mother f***, I just found you. You mother f***, now you're going to see." According to defendant, the two men spent approximately six and a half minutes cursing at each other. Defendant denied mentioning Lopez on the phone, but claimed that the other individual brought up Lopez. Defendant denied knowing Lopez, and claimed that he had never seen Lopez before his testimony in defendant's case. On cross-examination, defendant denied calling his wife from jail and asking her to call Audrey and Valentin and tell them he made a mistake.

¶ 26 Kimberly Hofsteadter testified in the State's rebuttal case that she was employed by the Cook County Department of Corrections as an investigator. Through her, the State introduced a

recording made on October 21, 2020, of a phone call between defendant and Evelyn. The call, which was had in Spanish, was interpreted as the defendant saying: "If you could call those people and let them know and tell them I'm sorry. That they were the ones that said that, to please not do anything else. Maybe I was scared and I was drunk. Tell them that I'm sorry."

¶ 27    Defendant testified in surrebuttal. He admitted that he did ask his wife to call Valentin and Audrey, but that he had forgotten until he heard that phone call.

¶ 28    Following closing arguments, the trial court instructed the jury. Relevant to some of defendant's arguments on appeal, we cite parts of those instructions here. Regarding the burden of proof, the trial court stated, "The State has the burden of proving guilt beyond a reasonable doubt. This burden is on the State throughout the case and is not required to prove his innocence."[2] After the trial court instructed the jury about the elements of the offense of harassment of a witness regarding Valentin, the trial court stated, "If you find from all the evidence that *any one* of these propositions have been proved beyond a reasonable doubt, you should find the defendant guilty. If any one of these propositions has not been proven beyond a reasonable doubt, you should find the defendant not guilty (emphasis added)." When the trial court instructed the jury about this offense regarding Audrey, it stated "each" instead of "any one."

¶ 29    Lastly, the trial court read the jury an instruction which defined harassment of a witness as when an individual "with intent to harass or annoy one who may be expected to serve as a witness in a pending legal proceeding, because of the potential testimony of the witness, communicates directly or indirectly with that witness in such a manner to produce mental anguish or emotional

_____

[2]As discussed below, the accuracy of the record initially filed with this court is contested. Nevertheless, for the sake of completeness, we recite the trial court's instructions as they appeared in the record initially.

distress." However, the State charged defendant with a different theory of harassment of a witness, one which required the threat of injury.

¶ 30    The jury found defendant not guilty of harassment of a witness with respect to Audrey, guilty of harassment of a witness with respect to Valentin, and guilty of intimidation with respect to both Audrey and Valentin.

¶ 31    On July 15, 2022, the trial court sentenced defendant to seven years' imprisonment for the harassment count and concurrent terms of eight years' imprisonment for the intimidation counts. Defendant filed a notice of appeal on July 15, 2022.

¶ 32    During the pendency of this appeal, the State filed a motion in this court seeking an order directing the Office of the Official Court Reporters to prepare and certify a corrected transcript. The State claimed that multiple portions of the report of proceedings contained errors in the trial court's jury instructions and that consultation with the court reporter, Kimberley Titsworth, confirmed that the transcript was inaccurate. On April 23, 2025, we denied that motion but ordered the case remanded to the trial court for the limited purpose of holding a hearing to determine whether the record should be corrected.

¶ 33    On May 9, 2025, the trial court held that hearing as ordered. The trial court stated of the portions of the jury instructions in question, "I read the transcript, and that's not something I would have said." The official court reporter who transcribed the portion of defendant's trial that contained the jury instructions, Titsworth, testified that she reviewed the transcript of the proceedings from May 4, 2022, and then listened to a digital audio recording she made of the proceedings. She testified that her hand-held recorder is usually placed on the top ledge of the trial court's bench, but she did not specify where she placed it on May 4, 2022. Titsworth testified that

after listening to the audio recording, she determined that the portion of the transcript which read, "This burden is on the State throughout the case and is not required to prove his innocence," should have included the word "defendant" instead of the word "and," and should have had a period after the word "case." Next, she testified that the portion of the jury instructions which read, "If you find from all the evidence that any one of these propositions have been proved beyond a reasonable doubt, you should find the defendant guilty," was also incorrectly transcribed. Based on her review of the audio recording, she testified that "any one" in that sentence should have read "each of." She further testified that no one told her how the transcription should appear and no one told her to change her transcription prior to the hearing. The audio recording made by Titsworth was admitted into evidence and the trial court granted the State's motion to correct the record.

¶ 34 The "corrected" transcript submitted to this court reflects that the trial court said of the harassment count regarding Valentin, "If you find from all the evidence that each of these propositions have been proved beyond a reasonable doubt, you should find the defendant guilty." This transcript also reflects that the trial court said, "The State has the burden of proving guilt beyond a reasonable doubt. This burden is on the State throughout the case. Defendant is not required to prove his innocence."

¶ 35 The parties provided supplemental briefing on the issue of the trial court's ruling to correct the record.

¶ 36                                    II. ANALYSIS

¶ 37 On appeal, defendant argues that he was not proven guilty beyond a reasonable doubt of harassment of a witness with respect to Valentin and contends that a number of errors deprived him of a fair trial. Specifically, he argues first that issues with the Spanish interpreter deprived him

of his right to due process and to be present. Next, he argues that the trial court erred in instructing the jury by making omissions or alterations of critical words and by providing an incorrect theory of harassment that was different from the theory alleged by the State. Third, defendant argues that the trial court erred by excluding evidence that would have impeached Audrey and Valentin. In his supplemental briefing, defendant argues that the trial court erred in ordering the correction of the record. Given our disposition, we need not reach all of defendant's contentions.

¶ 38                              A. Sufficiency of the Evidence

¶ 39     Defendant argues that the State failed to prove beyond a reasonable doubt that he committed the offense of harassment of a witness with respect to Valentin.

¶ 40     The State must prove every element of a charged crime beyond a reasonable doubt. U.S. Const. amends. V, XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 363-64 (1970); *People v. Weinstein*, 35 Ill. 2d 467, 469-70 (1966). On appellate review, this court does not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found every element proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Smith*, 185 Ill. 2d at 541. We must reverse a conviction when the evidence is so unsatisfactory, unreasonable, or improbable as to justify reasonable doubt of a defendant's guilt. *Smith*, 185 Ill. 2d at 542.

¶ 41     The State charged defendant with harassment of a witness with respect to Valentin under a threat of injury theory. Under that theory, the State had to prove that defendant intended to harass Valentin, who was expected to serve as a witness in a pending legal proceeding, and that defendant

communicated, directly or indirectly, a threat of injury to Valentin because of Valentin's potential testimony. 720 ILCS 5/32-4a(a) (West 2020).

¶ 42    Harassment of a witness is a specific intent crime, requiring the State to prove defendant intended to harass Valentin. *People v. Nix*, 131 Ill. App. 973, 975 (1985). However, the requisite intent may be inferred from the facts and circumstances surrounding the communication. *Id*. The harassment of a witness statute does not draw distinctions between the importance of witnesses, nor does it contemplate whether potential witnesses actually have the power to affect or terminate the proceedings. 720 ILCS 5/32-4a(a) (West 2020). The purpose of the statute is to protect witnesses and jurors from being mistreated because of their involvement in court proceedings. *People v. Cardamone*, 232 Ill. 2d 504, 517 (2009).

¶ 43    There is no dispute that Audrey and Valentin did not witness the incident that precipitated the criminal charges against Lopez. It is also undisputed that they were possible life and death witnesses for their brother, Jose.

¶ 44    Audrey's testimony was that during the second phone call on October 2, 2020, defendant told Valentin he would kill him and Audrey "if you do not do away with the charges against Christopher Lopez." She also testified that defendant threatened Valentin by saying, "I'm going to go put an AK-47 on your head if you don't dismiss the case of Christopher Lopez." Valentin similarly testified that defendant threatened him and demanded, "You better stop these charges against Christopher Lopez."

¶ 45    There is no dispute that defendant threatened Valentin. Defendant's own testimony established that fact, though his stated reasoning for doing so had nothing to do with Lopez and the content of his threat was considerably more restrained. Based on the testimony, there is also

no dispute that defendant intended to harass Valentin. He took phone numbers from his wife's phone, got drunk, and began dialing numbers only to verbally assail whoever answered the phone and emit a torrent of threats. Thus, the only real dispute is whether defendant intended to do so because of Valentin's involvement in the Lopez prosecution.

¶ 46　Defendant argues that there was no evidence that he knew Valentin might be a witness, and that instead, defendant's threats and demand that Valentin "stop those charges against Christopher Lopez" only evinced a belief that Valentin had a familial interest in the *Lopez* case. That is certainly one inference the jury could have made.

¶ 47　But given the testimony at trial, the jury could have reached a very different conclusion. Both Audrey and Valentin testified that numerous supporters of Lopez appeared at the two different court dates at the Daley Center and Bridgeview, where they observed those supporters engaging in behavior such as mocking them, taking photos of them, or cursing at them. Defendant was present at the second court date in Bridgeview, and he pointed at Audrey and Valentin and cursed. And soon after that Bridgeview court date, Audrey and Valentin received a phone call where defendant unleashed his wave of threats against Audrey, her son, and Valentin. While doing so, he demanded that they "stop" or dismiss the charges against Lopez. A clear inference to be made is that defendant believed Valentin to be an essential part of the prosecution against Lopez, and that Valentin could aid in the dismantling of that prosecution by refusing to cooperate or by asking the prosecutor to dismiss the case. The fact that defendant misapprehended Valentin's importance to the case or his ability to stop the prosecution is, by the plain language of the statute, completely inconsequential.

¶ 48    Defendant argues against this inference by pointing out that defendant never communicated specifically about Valentin's testimony. He relies on *Nix* for this proposition, but nothing in *Nix* supports the view that defendant's communication must contain such an overly formalistic and specific discussion. In *Nix*, the court reversed defendant's conviction for harassment of a witness. *Nix*, 131 Ill. App. 3d at 975. The defendant was in a restaurant with a witness who got up to use the restroom. *Id*. at 973-74. The defendant followed the witness to the restroom and grabbed her arm as she opened the restroom door and said, "How is it going?" *Id*. at 974. After the witness exited the restroom, the defendant said, "I want to talk to you." The court reasoned that neither of those statements demonstrated an intent to harass or annoy and there was no evidence that defendant's presence in the restaurant was anything more than purely coincidental. *Id*. at 975. Moreover, the court regarded the statements as innocuous. *Id*.

¶ 49    *Nix* is inapposite when compared to defendant's case. Defendant's actions were neither innocuous nor coincidental. And unlike the defendant in *Nix*, defendant here specifically referenced Valentin's involvement in Lopez's case. It was not unreasonable or irrational for the jury to draw an inference that defendant was harassing Valentin because he thought Valentin was a witness in the *Lopez* case, even if defendant did not know or understand the precise nature of Valentin's involvement.

¶ 50    Accordingly, we conclude that, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found every element of the offense proven beyond a reasonable doubt.

¶ 51                                B. Correction of the Record

¶ 52    We next address defendant's claim that the trial court erred by granting the State's motion to order a correction of the trial transcript, as the resolution of this issue is necessary for our consideration of defendant's claims regarding the jury's instructions.

¶ 53    The record on appeal consists of a number of elements including a transcript of the proceedings created by a court reporter. Ill. S. Ct. R. 608(a) (eff. July 1, 2017). "The record on appeal shall be taken as true and correct unless shown to be otherwise and corrected in a manner permitted by [Rule 329]." Ill. S. Ct. R. 329 (eff. July 1, 2017). "Material omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court, or by the reviewing court or a judge thereof." *Id.* "Any controversy as to whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by that court and the record made to conform to the truth." *Id.*

¶ 54    The burden to show that the record is incorrect falls on the party alleging the inaccuracy. See *People v. Allen*, 109 Ill. 2d 177, 184 (1985). The inaccuracy must "be proved by the production of some note or memorandum from the records or quasi-records of the court, or by the judge's minutes, or by the papers on file in the cause." *Allen*, 109 Ill. 2d at 184; see also *Hartgraves v. Don Cartage Co.*, 63 Ill. 2d 425, 428 (1976) ("An amendment of a record cannot be made either from the memory of a witness, from the recollection of the judge himself, or by affidavit, but the record must show the basis upon which the amendment or correction is made."). The record or quasi-record must be "definite and precise." *People v. Merritt*, 395 Ill. App. 3d 169, 178 (2009);

*People v. Wear*, 371 Ill. App. 3d 517, 525 (2007) (quoting *Beck v. Stepp*, 144 Ill. 2d 232, 239 (1991) (overruled on other grounds)).

¶ 55     Defendant urges us to review the trial court's decision *de novo* because the only relevant evidence it considered was the audio recording itself. See *People v. Morgan*, 2025 IL 130626, ¶ 21 (*de novo* review is appropriate when the trial court has based its decision on documentary evidence alone because the reviewing court stands in the same position as the trial court). The State contends that correction of the record is a discretionary act and therefore we should review the trial court's order for an abuse of discretion. See *Joseph D. Foreman & Co. v. Neri*, 6 Ill. App. 3d 313, 316-17 (1972) (trial court did not abuse its discretion in denying motion to supplement the record). Under either standard, our disposition of this issue would remain the same.

¶ 56     Defendant relies on *Merritt* and *Wear* for the "definite and precise" standard. The State counters that the "definite and precise" standard should not apply because both *Merritt* and *Beck*, upon which *Wear* relied, involved *nunc pro tunc* orders. But in both those cases, the *nunc pro tunc* order was a correction to the record. *Merritt*, 395 Ill. App. 3d at 177; *Beck*, 144 Ill. 2d at 235. We fail to see how whether the trial court here labeled its order as *nunc pro tunc* or not alters the analysis. The essence of the issue is the same: the trial court here entered an order to give retroactive effect to what was ostensibly said at defendant's trial. See *Pestka v. Town of Fort Sheridan Co., L.L.C.*, 371 Ill. App. 3d 286, 295 (2007) ("A *nunc pro tunc* order is an entry now for something that was done on a previous date and is made to make the record speak now for what was actually done then."). In any event, *Merritt* concerned a *nunc pro tunc* order that corrected the transcript of the defendant's guilty plea. *Merritt*, 395 Ill. App. 3d at 177. Thus, we see no reason why the "definite and precise" standard should not apply.

¶ 57    Defendant's first argument that the trial court's order was error is that an audio recording was not a "record or quasi-record" maintained by the court but, rather, a personal audio recording created by the court reporter and stored on her personal laptop. Defendant asserts that the court reporter's stenographic notes, the production of which is required by the Court Reporters Act, are what must be used in the creation of a transcript and that an audio recording may only be used as a supplement. 705 ILCS 70/5 (West 2020). Indeed, a court reporter's stenographic notes, in conjunction with the court reporter's testimony and the marked "given" instructions, have been held to be sufficient to correct an inaccuracy in a transcript. *Allen*, 109 Ill. 2d at 184-86. Defendant asserts that there is no authority to conclude that an audio recording is sufficient to support a correction of a transcript, and the State here did not introduce the court reporter's stenographic notes.

¶ 58    But in the context of *Allen*, the court reporter's stenographic notes are not a record produced or maintained by the court, either, and yet they were still considered as evidence that the transcript was inaccurate. *Id*. Thus, we are not persuaded by defendant's argument that the audio recording created by the court reporter was insufficient evidence to support a correction to the transcript. Whereas the trial court in *Allen* had the court reporter's testimony and stenographic notes, the trial court here similarly had the court reporter's testimony and the audio recording of the proceedings. *Allen*, 109 Ill. 2d at 184. However, we need not resolve whether the court reporter's audio recording qualifies as a "record or quasi-record" because even when considered, the audio recording does not persuade us of the propriety of the trial court's order.

¶ 59    The problem here is less about the type of evidence provided, and more its contents. The interpretation most favorable to the trial court is that the audio clips provided to us, whether it be

from the quality of the audio or some other reason, do not provide "definite and precise" evidence that the trial court correctly recited the jury instructions so as to justify correction of the record. The interpretation least favorable to the trial court is that the audio clips are evidence that the trial court read the instructions incorrectly. We address the two instructions in question in turn.

¶ 60 The original transcript reflects that the trial court read to the jury the elements that the State had to prove to establish that defendant committed harassment of a witness with respect to Valentin. It then stated, "If you find from all the evidence that any one of these propositions have been proved beyond a reasonable doubt, you should find the defendant guilty." Clean, unmarked copies of this instruction, for either Audrey or Valentin, do not appear in the record. However, the marked copies reflect the correct language in conformity with the State's burden of proof.

¶ 61 We have carefully and repeatedly reviewed the audio file provided to us in the record related to this instruction. It is six seconds long and contains some background white noise. The audio is constant and does not appear to cut out at any point. From that recording, it is easy to glean that the trial court stated, "If you find from all the evidence." It is also easy to discern that the trial court stated, "*** have been proved beyond a reasonable doubt, you should find the defendant guilty." Whether it is due to the quality of the microphone or the position of the trial court relative to the microphone or the trial court's speech, it is what takes place between those two phrases that is difficult to parse. Based on our repeated review of this audio recording, it appears that the trial court did not say *either* "each of" or "any one." Both appear to be absent. The audio file sounds as though the trial court stated in full, "If you find from all the evidence these propositions have been proven beyond a reasonable doubt, you should find the defendant guilty." But even "propositions" sounds truncated and is missing syllables.

¶ 62    The exact content of the sentence is unclear, but what is clear from the recording is that the words "each one" are not present. This is not simply a conclusion drawn from words that are inaudible. Rather, for the trial court to be correct that it read the instructions properly, there should be multiple syllables of speech between "evidence" and "these propositions." These syllables do not exist, and likewise there is no gap in time between "evidence" and "these propositions" where these syllables could have fit. Regardless, the question before us is not to parse exactly what is said on the audio recording. The question is whether the audio proves the transcript is inaccurate and warrants overriding the written transcript with what is contained in the written instructions. It does not.

¶ 63    Next, the original transcript read: "The State has the burden of proving guilt beyond a reasonable doubt. This burden is on the State throughout the case and is not required to prove his innocence." The unmarked instruction in the record, file stamped May 4, 2022, reads: "The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

¶ 64    We have likewise reviewed the included audio file relevant to this instruction carefully and repeatedly. It is nine seconds long and also contains some background white noise. Like the first file, there are portions of the audio that are incredibly difficult to decipher. For example, in the audio clip, the trial court can be heard saying, "The State has the burden," but the next few words between that and "beyond a reasonable doubt" are largely unintelligible. It does sound in this instance like the microphone did not detect all of the audio in this phrase. However, the remainder of the clip is easier to understand, and it does indeed sound as though the trial court spoke in

conformity with the original transcript. That is to say, "This burden is on the State throughout the case and is not required to prove his innocence."

¶ 65    Regardless of our interpretation of the audio, and whether the trial court actually said "and" rather than "defendant," as previously noted our task is not to definitively decipher or conclude what the trial court said. It is to determine if the State proved that the trial transcript is inaccurate such that it warranted correction. In this instance, we cannot agree with the State. Whether the trial court said "defendant" instead of "and" but the audio failed to record it is unknowable. But what is knowable is that in the audio file in this record, the trial court said a word that *sounds* like "and" and has only one syllable.

¶ 66    In short, the audio file fails to provide "definite and precise" evidence that the trial court spoke in conformity with the law. The remaining evidence does not persuade us of the need to correct the record, either. The court reporter's testimony only established foundation for the audio recording and her belief that she made an error after listening to the recording. She did not testify as to what was said at trial, nor would that be permissible if she had. *Hartgraves*, 63 Ill. 2d at 428. The same can be said for the trial court's repeated assertions that it knows the law and would not have said the things in the original transcript. *Id*. The only remaining evidence in the record that supports the correction of the record in any capacity is the existence of typewritten jury instructions that contain the correct language. But the mere fact that an instruction is found in the record does not prove that the jury was so instructed. *People v. Vincent*, 165 Ill. App. 3d 1023, 1030 (1988). If the audio bore the weight that the State and the trial court have placed on it, the jury instructions might be additional supporting evidence. But given our review of the audio files and our conclusion that its contents do not support the trial court's decision, it would be immensely illogical to

conclude that the trial court must have spoken in conformity with the instructions simply because that is how they are written.

¶ 67    In sum, the original record is presumed to be correct. Ill. S. Ct. R. 329 (eff. July 1, 2017). Nothing the State offered into evidence at the hearing provided definite and precise evidence that the transcript was incorrect to justify altering it in the manner ordered by the trial court.

¶ 68    Accordingly, the trial court's order was in error and we consider defendant's remaining contentions using the original version of the transcript that was submitted to this court.

¶ 69                                 C. Jury Instructions

¶ 70    Criminal defendants have a due process right to have the jury properly instructed on the law. U.S. Const. amend. XIV; Ill. Const. 1970, art. I, §§ 2, 8; *People v. Smith*, 2019 IL App (1st) 161246, ¶ 42 (citing *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)). The trial court has a duty to inform the jury as to the law. *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977). It also bears the burden of ensuring that the jury is instructed on the elements of the crime charged, on the presumption of innocence, and on the question of burden of proof. *People v. Parks*, 65 Ill. 2d 132, 137 (1976). We apply *de novo* review to these legal issues. *People v. Herron*, 215 Ill. 2d 167, 174 (2005).

¶ 71    Defendant argues that the trial court made three errors in the instructions given to the jury which unfairly prejudiced him and require a new trial. First, he argues that the instructions recited a theory of harassment of a witness that differed from the theory alleged by the State. Second, he claims the trial court erred by instructing the jury that it could find defendant guilty of harassment of a witness regarding Valentin if the State proved "any one" of the elements beyond a reasonable doubt. And third, he argues that the trial court erred by omitting the words "the defendant" from

the portion of the reasonable doubt instruction that informed the jury that defendant is not required to prove his innocence. We address these in turn.

¶ 72                              1. Theory of Harassment of a Witness

¶ 73    When it instructed the jury, the trial court defined harassment of a witness as an occurrence where defendant "with intent to harass or annoy one who may be expected to serve as a witness in a pending legal proceeding, because of the potential testimony of the witness, communicates directly or indirectly with that witness in such a manner to produce mental anguish or emotional distress." This is a valid theory by which the State may pursue a conviction for harassment of a witness. 720 ILCS 5/32-4a(a) (West 2020). But it is not the theory under which defendant was charged. Instead, as we have noted, defendant was charged under the theory which requires a threat of injury or damage to property. *Id*. Defendant contends that this was reversible error, but we disagree.

¶ 74    As the State points out, this was invited error. See *People v. Carter*, 208 Ill. 2d 309, 319 (2003) ("Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error.") During the jury instruction conference, the trial court identified the instruction in question as "People's 11." This instruction, derived from Illinois Pattern Instruction 22.11, recited the theory of harassment of a witness that requires a defendant to communicate with a witness "in such a manner as to produce mental anguish or emotional distress." Illinois Pattern Jury Instructions, Criminal, No. 22.11. The trial court stated, "People's 11, the definition of harassment of a witness. That's 22.11, the definition of the offense of harassment of a witness. Any objection to the definition of the offense?" Defense

counsel responded, "Definition of the offense, no objection." Defense counsel acquiesced to that instruction, and cannot now complain that the trial court did precisely as he wanted.

¶ 75    Alternatively, defendant argues that defense counsel's failure to object constituted ineffective assistance of counsel. To demonstrate ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient, and that that deficient performance  so prejudiced the defendant that he had a reasonable probability of obtaining a different outcome but for counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984).

¶ 76    The State concedes that in the context of ineffective assistance of counsel, the failure to object here was an error. But we agree with the State in that we cannot find the requisite prejudice to accompany that error. The jury was not instructed as to the correct theory, namely about the requirement that defendant must have made a threat of injury or damage to property. The fact that defendant threatened Valentin was undisputed. Even defendant's own testimony established that he threatened Valentin. The primary disputed issue was whether defendant harassed and threatened Audrey and Valentin specifically because of their status as witnesses in the Lopez case, and the incorrect instruction had no bearing on that determination. As the State points out, even directly conflicting instructions may be harmless when they do not concern a disputed essential issue in the case so that there is not a fear that the jury relied on the incorrect instruction. See *People v. Woods*, 2023 IL 127794, ¶¶ 54-55. An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed. *Id*. ¶ 55. Given the undisputed fact that defendant threatened Valentin, the outcome would have been the same if defense counsel had objected to the incorrect instruction and insisted upon the correct

definition. Thus, we do not find the prejudice necessary to grant defendant a new trial based on a theory of ineffective assistance of counsel for this issue.

¶ 77                    2. Burden of Proof and Presumption of Innocence

¶ 78    However, the trial court's errors regarding its instructions for the elements of harassment of a witness and the State's burden of proof are undoubtedly more dire, more significant, and ultimately, require a new trial.

¶ 79    Defendant admits that neither of the trial court's errors here were preserved, but we may nevertheless review them as plain error and under Supreme Court Rule 451(c). Supreme Court Rule 451(c) provides that substantial defects in jury instructions are not waived by a failure to make timely objections thereto if the interests of justice require. Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). "Rule 451(c) is coextensive with the 'plain error' clause of Supreme Court Rule 615(a), and we construe these rules 'identically.' " *People v. Hartfield*, 2022 IL 126729, ¶ 49 (quoting *Herron*, 215 Ill. 2d at 175). The plain-error clause of Rule 615(a) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

¶ 80    Plain error occurs where "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *Hartfield*, 2022 IL 126729, ¶ 50. In the first instance, the defendant must show that clear or obvious error occurred and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *Id*. In the second instance, the defendant must show that clear or obvious error occurred and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *Id*. Under second prong plain

error, prejudice is presumed because of the importance of the right involved, regardless of the strength of the evidence. *Id*. Inherent in the plain-error analysis is a determination of whether any error occurred. *Id*. ¶ 51.

¶ 81   In sum, we are persuaded that the combined nature of these instructional errors warrants reversal for a new trial.

¶ 82                          a. Elements of the Offense

¶ 83   We start with the trial court's instruction that the jury could convict defendant of harassment of a witness of Valentin if it found that the State proved "any one" of the requisite propositions beyond a reasonable doubt. This instruction was indisputably incorrect, as the State's burden to prove all elements of a charged offense beyond a reasonable doubt is one of our most rudimentary and undeniable principles. *In re Winship*, 397 U.S. at 364.

¶ 84   However, if error occurred, we must also determine if it was plain error. *People v. Sanders*, cited by defendant, provides facts that are instructive and analogous in every meaningful way. In *Sanders*, the defendant was charged under a theory of accountability for two counts of attempt murder, and one count of armed robbery, home invasion, and murder. *People v. Sanders*, 129 Ill. App. 3d 552, 553 (1984). The trial court orally instructed the jury about the elements of attempt murder and that it could find the defendant guilty of attempt murder if it found the State had proved "any one" of the requisite propositions beyond a reasonable doubt. *Id*. at 562. Meanwhile, the written instruction told the jury that to acquit the defendant, it would have to find that the State failed to prove each element. *Id*. Reviewing the issue under the plain error doctrine, the court reversed defendant's conviction for attempt murder because "the error in instructions occurred in an essential mandatory instruction which explained the burden of proof. It was not a mere technical

defect or an error in a non-mandatory instruction which frequently may be remedied by reading the entire series of instructions as a whole." *Id.* at 563. It also reasoned that the oral and written instructions provided contradictory grounds by which the jury was to reach a not guilty verdict. *Id.*

¶ 85 Here, like *Sanders*, the oral instruction improperly defined the State's burden of proof as to the harassment charge involving Valentin. And while there was not a written instruction that incorrectly defined what the jury would have to find to acquit defendant, instead we are presented with a situation where the jury may not have received a copy of the unmarked instructions for this offense at all.

¶ 86 Although the record contains a number of the unmarked instructions sent to the jury, the instructions containing the requisite elements for harassment of a witness for both Audrey and Valentin are not present. The State contends that their absence proves nothing because it is defendant's burden to provide a sufficiently complete record. While true that an appellant has the burden to provide a complete record, *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984), defendant's claim is that the unmarked copy of the instruction does not exist. Therefore, he cannot possibly include in the record something that does not exist. Defendant's briefing represents that he contacted the Clerk of the Cook County Circuit Court to investigate and that no such unmarked copy was found—a representation that the State does not dispute or challenge. Thus, while the absence of these written instructions is not conclusive evidence that they never reached the jury, it is at least some evidence of that proposition. And there is nothing that the State points to that would tend to show the opposite.

¶ 87 Thus, we are left with a scenario where the jury received a defective oral instruction about the State's burden of proof, and there is no convincing evidence to conclude that the jury received

a written copy with the correct language. Moreover, the jury received a contradictory oral instruction in that it was told that it could convict defendant of harassment of a witness of Audrey only if the State proved *each* proposition beyond a reasonable doubt. And crucially, Audrey was party to the same threats and demands as Valentin—the two were together listening to defendant's threats on speakerphone. In that context, we cannot ignore the fact that, when properly instructed, the jury acquitted defendant of this charge with respect to Audrey.

¶ 88    As our supreme court said in *Jenkins*:

"When the instructions are contradictory the jury is put in the position of having to select the proper instruction—a function exclusively that of the court. As far as can be known, defendant might well have been convicted on the basis of the erroneous instructions. Certainly, a person should not stand to lose his liberty because a jury has received equivocal instructions." *Jenkins*, 69 Ill. 2d at 67.

¶ 89    "We must assume that jurors do not fall short of their constitutional functions and follow the instructions of the trial judge. This assumption is part and parcel of our system." *Id*. At a minimum, the flawed oral burden of proof instruction with respect to the offense against Valentin, contrasted with the correct oral instruction with respect to Audrey, threatened to tip the scales against defendant. The evidence pertaining to both charges was essentially the same, and yet defendant was acquitted of harassing Audrey. The possibility that the jury convicted defendant of harassing Valentin because it obeyed the trial court's instruction that it could find defendant guilty if only one proposition was proven beyond a reasonable doubt is one we cannot ignore.

¶ 90    However, even if we were to ignore the strength of the evidence, this error would still constitute second-prong plain error. As *Sanders* noted, instructions on the elements of the charged

offenses, the presumption of innocence, and the burden of proof are essential, and the failure to properly instruct the jury in any one of these areas serves to deprive the accused of a fair and impartial trial. *Sanders*, 129 Ill. App. 3d at 563. "The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *Francis v. Franklin*, 471 U.S. 307, 313 (1985) (quoting *In re Winship*, 397 U.S. at 364 (1970)). This "axiomatic and elementary constitutional principle" is "bedrock" for our system of justice. *Francis*, 471 U.S. at 313. Defendant did not receive the benefit of this bedrock principle, and that cannot be viewed as anything but a threat to the integrity of the judicial process.

¶ 91                           b. Defendant Need Not Prove His Innocence

¶ 92    Next, we consider defendant's argument that the trial court's flawed instruction, which omitted the principle that defendant need not prove his innocence, also constituted reversible error. Thus, first, we consider whether the trial court's misstatement of the law was error. Here, the jury was instructed properly regarding the first half of criminal IPI 2.03. Illinois Pattern Jury Instructions, Criminal, No. 2.03. This portion informed the jury that defendant was presumed innocent, that the presumption remained with him at every stage of trial, and that the presumption could only be overcome if they were convinced beyond a reasonable doubt that defendant was guilty. However, the next portion of the instruction contained a misstatement. The jury was orally instructed that the State had the burden of proving defendant's guilt beyond a reasonable doubt and that the burden remains on the State throughout the case. But where the trial court should have told the jury, "The defendant is not required to prove his innocence," it instead suggested that the

State was not required to prove defendant's innocence. The unmarked, "clean" instruction contained the correct language.

¶ 93    "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978) (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)). "While the legal scholar may understand that the presumption of innocence and the prosecution's burden of proof are logically similar, the ordinary citizen may well draw significant additional guidance from an instruction on the presumption of innocence." *Id*. at 484. The United States Supreme Court described that the presumption "cautions the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced." *Id*. at 485.

¶ 94    But in a case like this one where the defendant testified, there is another benefit that can be seen from the admonition that he is both presumed innocent and that he does not have to prove innocence. As our supreme court said in the context of Rule 431(b) *Zehr* questions:

> "If jurors do not understand and accept that the defendant is presumed innocent, then credibility contests could lean in the State's favor, which could tip the scales of justice against the defendant in a close case. Or if jurors do not understand and accept that the State bears the burden of proof beyond a reasonable doubt, then, again, credibility contests could lean in the State's favor, which also could tip the scales of justice against the defendant in a close case. A jury that does not understand and accept those principles may weigh the evidence in favor of the State or render a guilty verdict on insufficient proof,

again tipping the scales against the defendant in a close case." *People v. Sebby*, 2017 119445, ¶ 67.

¶ 95 Informing the jury that the State was not required to prove defendant's innocence was certainly a correct statement of the law. But that instruction was not the required statement of the law, nor did it provide the jury with a complete picture of the law. The oral instructions failed to inform the jury that defendant, who presented multiple witnesses and testified in his own defense, did not have to prove a single thing. A necessary and logical component of the presumption of innocence and the State's burden of proof is that the jury could disbelieve every single one of defendant's witnesses, including his own testimony, and nevertheless acquit him because the State failed to meet its burden. Here, the oral instructions conveyed only part of the presumption of innocence, and omitted a portion of the instructions that helps ensure that jurors would not turn defendant's trial into a credibility contest where the outcome hinged merely on which witnesses they believed. *Sebby*, 2017 119445, ¶ 67.

¶ 96 Defendant contends that this case is like *People v. Williams*, where the trial court failed to give IPI 2.03—regarding the burden of proof and presumption of innocence—in its entirety in either a written or oral form and the only mention of the presumption of innocence or the burden of proof was during *voir dire*. *People v. Williams*, 120 Ill. App. 3d 900, 902 (1983). The defendant in *Williams* was granted a new trial on the basis that the complete failure to instruct the jury about those principles deprived the defendant of a new trial. *Id*. at 903.

¶ 97 Defendant's case here is distinguishable. Here, the jury was properly instructed on the majority of IPI 2.03 orally, and the written version that was provided to the jury was the correct version of 2.03 in its entirety. Illinois Pattern Jury Instructions, Criminal, No. 2.03. And as the

State points out, potential jurors were told during *voir dire* that defendant was not required to prove his innocence. Thus, we cannot say, like in *Williams*, that the jury was completely deprived of the principles contained in this instruction.

¶ 98    Nor can we say, however, that this issue was of no consequence because the potential jurors were told defendant did not have to prove his innocence during *voir dire*, and because defense counsel argued it in closing arguments. As we noted earlier, this instruction falls among a select few for which the burden to give them falls upon the trial court. *Parks*, 65 Ill. 2d at 137. The principles in IPI 2.03 are essential and mandatory. *Sanders*, 129 Ill. App. 3d at 563. If it were enough for jurors to hear these principles during *voir dire* at the start of a multi-day trial, before they had been selected to serve and before they heard any evidence, including defendant's testimony, there would be little sense to call these instructions essential and mandatory.

¶ 99    But more importantly, the admonishments in *voir dire* and the correct written instruction did not replace an absent oral instruction. The trial court's oral instruction contradicted the written instruction and the *voir dire* admonishments; one told the jury that defendant was not required to prove his innocence and one told the jury that the State was not required to prove his innocence. Thus, the jury was left to select the correct instruction, and we have no way of determining upon which version they relied. *Jenkins*, 69 Ill. 2d at 67.

¶ 100   Clearly, providing the jury contradictory instructions—a written instruction that conforms to the law and an oral instruction that distorted part of the burden of proof and presumption of innocence—was error. But the question is whether it was plain error that either threatened to tip the scales because of the closeness of the evidence or deprived defendant of a fair trial and threatened the integrity of the judicial process.

¶ 101   However, we need not make that determination in a vacuum. "Jury instructions are sufficient if, as a whole, the series of instructions fully, fairly, and comprehensively apprised the jury of the relevant legal principles." *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 50 (citing *People v. Marcos*, 2013 IL App (1st) 111040, ¶ 68). The jury was given a flawed burden of proof instruction *and* conflicting instructions about whether defendant had no obligation to prove his innocence. Together, these instructions did not "fully, fairly, and comprehensively" apprise the jury of the relevant legal principles. Indeed, the deficiencies in the instructions had to do with some of the most essential principles in our system of justice.

¶ 102   A jury instruction error rises to the level of plain error only when it "creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Hartfield*, 2022 IL 126729, ¶ 50. Here, multiple errors occurred regarding jury instructions of some of our most essential and fundamental principles in the criminal justice system. Jurors were asked to pick between contradictory oral and written instructions, or contradictory instructions for Valentin and Audrey. And even though defendant's threats and demands were communicated to both Audrey and Valentin, somehow in the jumble of instructions, the jury saw fit to acquit defendant of harassing Audrey. We simply cannot turn a blind eye to the possibility that these errors tipped the scales in the State's favor.

¶ 103   Nor can we say that these errors, in sum, did not threaten the integrity of the judicial process. Jurors rely on the trial court to instruct it as to these fundamental, bedrock principles. The jury guarantee is a "basic protection whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function. *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). The right to trial by jury reflects "a profound judgment about the way in which law should be

enforced and justice administered." *Id*. And the deprivation of that right has consequences which are "necessarily unquantifiable and indeterminate." *Id*. at 281-82. We cannot know precisely how these instructional errors affected the jury, but it is enough to know that the basic building blocks mortared into the structure of defendant's trial were defective. Such an edifice cannot be allowed to stand; it must be torn down and rebuilt anew.

¶ 104    Accordingly, these errors deprived defendant of a fair trial and entitle him to a new one.

¶ 105                                    D. Remaining Issues

¶ 106    Given our judgment that defendant's conviction must be reversed and remanded for a new trial, we need not reach his other contentions regarding the interpreter and the trial court's exclusion of impeachment evidence.

¶ 107    Furthermore, though we have addressed the sufficiency of defendant's conviction for harassing Valentin, we must briefly address defendant's convictions for intimidation to determine whether double jeopardy principles would bar retrial. The State charged defendant with intimidation of Audrey and Valentin under a theory that he threatened them with physical harm with the intent to cause them to perform or omit the performance of an act. 720 ILCS 5/12-6(a)(1) (West 2020). The State's evidence plainly set out that defendant threatened the lives of Audrey, her son, and Valentin and demanded that they "stop" or "dismiss" the criminal charges against Christopher Lopez. The evidence at trial was sufficient to convict defendant of these charges, and thus retrial will not offend principles of double jeopardy.

¶ 108    Finally, we address defendant's contention that this case should be remanded to a different trial court judge because the trial judge here exhibited impermissible bias. The trial court may not display bias or prejudice against either party. *People v. Fisher*, 2023 IL App (4th) 220717, ¶ 30.

Judicial restraint in the court's conduct and remarks is not limited to the presence of the jury but is required throughout all the court's dealings with the litigants who come before it. *Id*. To show bias, a defendant must "demonstrate that the judge displayed active personal animosity, hostility, ill will or distrust toward the defendant." *Id*. (quoting *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96).

¶ 109   Indeed, judges are required to be fair and dispassionate arbitrators above all else. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 38. The Illinois Code of Judicial Conduct of 2023 requires a judge to be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity." Ill. S. Ct. R. 2.8 (eff. Jan. 1, 2023). We observe that this would not be the first time we have remanded a case presided over by the trial judge here and assigned the case to a different judge based on his inappropriate comments. See *Jones*, 2016 IL App (1st) 141008, ¶¶ 37-38.

¶ 110   Not unlike *Jones*, the trial judge's conduct here reflected an animosity and sarcasm that went well beyond simply condemning defendant's actions or doubting the sincerity of his remorse. *Id*. Indeed, the trial court's invective was not even limited to defendant, and it felt the need to include defendant's wife, who was merely a witness and not a party to the litigation, in its derision.

¶ 111   During his allocution, defendant expressed his remorse for his actions and apologized to the complaining witnesses, Audrey and Valentin. The trial court decried defendant's offenses as "one of the worst crimes you can possibly get,"[3] and noted that defendant was "crying, carrying on." It then invoked a song it recalled from "many years ago. One of the lyrics says who's crying

---

[3]While defendant's offenses are no doubt serious and reprehensible, harassment of a witness and intimidation are Class 2 and Class 3 felonies, respectively. 720 ILCS 5/32-4a (West 2020); 720 ILCS 5/12-6(a)(1) (West 2020).

now?" The trial court also stated, "Mr. Bautista, there is an old saying, even great love affairs end eventually. Your time on the street ends eventually right now." And finally, of note, the trial court stated, "I can give them [the complaining witnesses] some consolation knowing you won't be around for at least a period of time. Their pain is continuous. What happens today to Mr. Bautista, yours may just be starting."

¶ 112    The trial court is no doubt entitled to condemn a defendant's actions and doubt the sincerity of his remorse. But that is distinct from the trial court's statements here which mocked defendant and turned what should be a solemn proceeding culminating in both deprivation of liberty and, hopefully, justice and relief for the victims, into an opportunity for the trial court to hurl insults at defendant and seemingly derive significant glee from imposing a sentence.

¶ 113    Then there are the comments the trial court directed at defendant's wife, Evelyn, during sentencing. The trial court thrice referred to Evelyn not by name, but rather as "the dutiful wife." The first time, the trial court said, "He wanted to tell the jury and he did tell the jury some ridiculous story. Or maybe his wife. The dutiful wife. Having an affair with Mr. Gudino. That's laughable."

¶ 114    Next, the trial court said, "There is something else I want to mention. Something about the dutiful wife that testified for Bautista." And third, the trial court stated, "His dutiful wife testified during the course of the trial. It hardly corroborated his version of what happened."

¶ 115    Not once did the trial court refer to Evelyn by name, first or last, instead opting each time to refer to her as the "dutiful wife." Why the trial court insisted on referring to Evelyn in this unseemly and undignified way, as though she were a prop and not a person, rather than affording her the dignity of her name cannot be countenanced. Moreover, after announcing defendant's sentence, the trial court said, "Maybe his wife will wait until he gets out."

¶ 116   To reiterate, the trial court is entitled to find defendant's remorse or the testimony of witnesses incredible, just as it is permitted to condemn defendant's behavior. But that is a far cry from using the bench to mock defendant, his wife, and the possible disintegration of their marriage. These comments reflected neither dignity nor courtesy.

¶ 117   The State claims that defendant cannot demonstrate any prejudice, but defendant has not raised this issue on the basis that the trial judge's conduct warrants a new trial. Instead, he has simply asked that retrial should take place before a different judge owing to the aforementioned conduct. We think this is a reasonable request. The trial court's comments, which were unwarranted and inappropriate, give us reason to doubt that defendant's retrial can be handled objectively and impartially.

¶ 118                                   III. CONCLUSION

¶ 119   The evidence at trial was sufficient to convict defendant of harassment of a witness with respect to Valentin, and intimidation with respect to Valentin and Audrey. However, the trial court erred in ordering the correction of the trial transcript, and the original transcript reflects that the fairness of defendant's trial was marred by defective instructions concerning some of the most fundamental principles in our criminal justice system. Accordingly, defendant's convictions must be reversed and this cause remanded for a new trial before a different judge.

¶ 120   Reversed and remanded.